(No. 88-CC-1961–

GENE GOVE, Claimant, *v.* THE STATE OF ILLINOIS,
Respondent.

*Opinion filed February 22, 1995.*

*Order on petition for rehearing filed October 19, 1995.*

STORMENT & BATES (PAUL M. STORMENT, JR., of
counsel), for Claimant.

JIM RYAN, Attorney General (JON MCPHEE, Assistant
Attorney General, of counsel), for Respondent.

## OPINION

PATCHETT, J.

Claimant seeks an award for serious personal injuries
sustained as a result of a motorcycle accident. This oc-
curred on Old Route 50 between Summerfield Road and
New Route 50 at the intersection of the two roads.

Claimant's exhibit 1 attached to the transcript in this
case is a drawing of the intersection in question. New
Route 50 runs in a generally southeast-northwest direc-
tion, and it is intersected by old Route 50 on the south. It
is a "T" intersection. As Old Route 50 approaches its in-
tersection with New Route 50, it approaches the intersec-
tion from a generally southeasterly direction; however,
approximately 1,000 feet from its intersection with New

Route 50, Old Route 50 curves to the right and intersects New Route 50 at a right angle. The curve is approximately 1,000 feet from the intersection of the two roads. Claimant was traveling on Old Route 50 approaching the intersection with New Route 50 when the accident occurred. Claimant contends that the Respondent was negligent in not placing or locating signs to adequately protect the safety of persons operating vehicles on Old Route 50 as it approached the "T" intersection. Respondent denies that it was negligent and asserts that there was adequate signing to provide adequate warning. The Respondent maintains that the accident and Claimant's injuries were proximately caused by Claimant's negligence.

The Claimant is a middle-aged man who has lived most of his life in the Mascoutah-Scott Field area of Illinois. Claimant is knowledgeable about the operation of motorcycles, and he has had a motorcycle license since he was 16. On the night of the accident, he was operating a 1200 cc. Harley Davidson motorcycle that was in excellent condition. He had a passenger named Debra Browning who was unavailable for the hearing. The Claimant had previously driven with passengers on long trips.

Prior to the night in question, Claimant had not driven on the road where the accident occurred. The Claimant testified that he had nothing to drink before the accident.

The Claimant was traveling on Old Route 50 toward the intersection and observed a sign indicating a curve to the right and a speed limit of 45 mph. The normal speed limit on the highway was 55 mph. When the Claimant had turned onto Old Route 50, he noticed that it was under some type of construction. Claimant was traveling 40 to 45 mph and was turning to the right as the road turned into a straight stretch. When Claimant first saw the stop sign, he realized he was at the end of the road and grabbed the

brakes on the motorcycle. This caused the motorcycle accident. Claimant testified that he did not observe any "Stop Ahead" sign, and he thought as he passed a "Junction 50" sign that the road continued on in a straight direction.

Claimant noticed the stop sign peripherally. Claimant testified that as far as he could remember, he was about 500 feet from the intersection when he first noticed the stop sign. He was traveling 40 to 45 mph, and he testified, "* * * I actually sat up and tried to see farther on the motorcycle seat to determine what reason a 'stop' sign would even be there for." Claimant looked ahead of himself, "more or less in a strained fashion to try to find the reason for the stop sign." He further testified, "it only took a couple of seconds to realize that I was simply out of road." He applied the brakes on his motorcycle in a panic. The wheels on the motorcycle locked and slid, flipping the bike over and pinning Claimant's left leg under the motorcycle. The motorcycle came to a stop in the middle of the "T" intersection.

The accident occurred near midnight, and Claimant testified that there was no artificial lighting at the intersection. Claimant stated that it was "very dark." Trooper Mark Bramlet's testimony was admitted by agreement of the parties through a copy of a discovery deposition attached to the transcript in this case. Bramlet was called at 12:33 a.m., and arrived at the scene at 12:55 a.m. (It should be noted that Bramlet reversed the descriptions of the roads as "Old" and "New" Route 50, in comparison with the testimony of other witnesses. This opinion reverses his descriptions for the sake of clarity.) There were several people standing at the intersection, and a motorcycle was lying in the middle of New Highway 50 slightly in the westbound lanes. The trooper did not speak with the Claimant at the scene.

Upon investigation, the trooper found no skid marks on the pavement. Trooper Bramlet interviewed the Claimant at the hospital. Bramlet noted on his report that the Claimant stated that he was unfamiliar with the roadway, and he lost control of his motorcycle as he attempted to stop at the intersection. Bramlet testified that he found no highway defects in the area. The last 1,000 feet or 750 feet of Old Highway 50 was straight and level. Vision of the intersection was obscured until 750 to 1,000 feet from the intersection.

The signing at the intersection in question was designed by Michael A. Kuhn, an employee of the Department of Transportation. Kuhn designed and supervised the installation of all signing at the intersection. Kuhn used the *Manual of Uniform Traffic Control Devices* and the IDOT policy. Kuhn did not believe that a double arrow sign at the intersection was needed. The original signs at the intersection consisted of a "Stop Ahead," "Junction 50," a green board—"Lebanon" to the left, "Carlyle" to the right—and a "Stop" sign with a "Cross Traffic Does Not Stop" underneath it. To the right of the stop sign, there was a U.S. 50 leader with a double arrow underneath it. The Stop Ahead sign was 800 feet from the intersection. The Junction 50 sign was approximately 600 feet from the intersection. The green board sign was 150 to 200 feet from the intersection, and the stop sign was at the intersection.

Most of the testimony in this case involved the necessity or advisability of additional signing, or different signing, at the intersection in question. The expert retained by the Claimant testified that the signing was inadequate and that a double arrow sign was advisable. Approximately three weeks after this accident, Michael Kuhn's supervisor instructed him to erect a double arrow

sign at the intersection. At the hearing, the supervisor testified that he was simply trying to improve the signing at the intersection. He strenuously asserted that the so-called "double arrow" sign was not required or mandatory under any of IDOT's policies or the *Manual of Uniform Traffic Control Devices*. The Claimant's expert witness had never been responsible for designing the signing on a public road, but claimed to have studied manuals. He also had practical experience while employed as an on-site construction worker.

That expert witness, Robert L. Porter, was a civil and structural engineer. He identified road and sign construction as "an area that I've involved my professional work." Porter denied having been hired by any states to do consulting signing. Porter considered his knowledge pertaining to signing of roads to be expertise "based upon practical knowledge that I obtained as a construction worker, my formal educational training, as well as my assessment of various situations relative to the existing standards of care that are well documented."

At the request of Claimant's counsel, Porter had examined the intersection in question on three occasions, the first being October 24, 1989. Porter had been furnished with, and made summaries of, discovery depositions of the Claimant, Gene Gove, and IDOT employees Michael Kuhn and Russell Rendleman. Porter stated that he had "taken into account the facts that were stated during those depositions." Porter conducted a night-time inspection of the intersection on November 20, 1989, and conducted a daytime inspection on January 16, 1990, at which time he performed measurements. His measurements were made with a "roller wheel." Porter examined the large drawing identified and admitted as Claimant's exhibit #2 and stated that the sign locations were similar

to what he found although measurements "may not necessarily be exact."

Oddly, Porter's measurements in connection with the sign locations in the case at bar were made from the intersection of Old Route 50 with the Summerfield Road toward the intersection of Old Route 50 with New Route 50, where the accident occurred. The sequence of signs encountered by Claimant as he approached the intersection where the accident occurred were related by Porter to be as follows:

First, a "Curve" sign with a 45 mph speed limit designation;

Second, a "No Passing Zone" sign on the left hand side of the roadway;

Third, "Stop Ahead" signs on both sides of the roadway;

Fourth, "Junction 50" sign on the right hand side of the road;

Fifth, green board sign with direction arrows to Lebanon and Carlyle;

Sixth, a "Highway 50" sign and a "Stop" sign (TR-126-128).

Porter recorded the distances from the Summerfield Road on all the signs through the "Junction 50" sign. Although he measured the distances, he did not record his measurements for the distances to the green board-Lebanon-Carlyle sign, or the stop sign. He measured the distance from the green board-Lebanon-Carlyle sign to the stop sign, but he did not record the distance. Porter testified that the green board-Lebanon-Carlyle sign was "in front of the stop sign," and "it (green board-Lebanon-Carlyle sign) is as far as the distance off the roadway."

Porter testified that the green Lebanon-Carlyle sign "does block the stop sign during the progress along the road." Porter did not measure the distance from the roadway to the Lebanon-Carlyle sign, and he did not measure the distance from the roadway to the stop sign.

Porter testified that as you progress westerly along Old Route 50, you can visualize the stop sign at New Route 50 from approximately 600 feet; yet, Porter did not measure that distance. He computed it on the basis of "some alternate set of numbers that deal with the distances off the New Highway 50 going backwards rather than dealing with thousands of feet." The Commissioner inquired further of Porter's estimation of the distance, and Porter acknowledged that he didn't use a mechanical measure but was basing the 600 foot quantity on his experience in having ridden on the road and a general idea of where the signs were at a time when he thought that the stop sign first came into vision.

Porter opined that the signing at the time of the accident was not adequate. Further, Porter stated that the "Stop Ahead" signs that had been installed prior to his inspection were ineffective because they were too far away from the intersection. It was also Porter's opinion that there was a need for a warning sign that shows a "T" intersection. Porter said that the "T" intersection sign should have been placed approximately 400 to 500 feet away from the intersection on the right hand side of the road. Porter opined that the "Stop Ahead" signs should have been placed 450 feet from the intersection. As placed, the "Stop Ahead" signs were 840 feet prior to the intersection. Porter opined that the green board sign should have been located on the opposite side of Highway 50, thus avoiding any obstruction to the stop sign at the intersection. Further, Porter stated in his opinion, a double arrow sign was a

"must" at the intersection because of the change of configuration and usage of the road. He observed an "oblique" background behind the intersection. Porter also indicated that barricade slat signage of a candy cane configuration in color should be incorporated with a double arrow sign, and produced photographs of such treatments (see Claimant's exhibits 17, 18, and 19). Porter approved of a placement of the "Curve" 45 sign and the "Junction 50" sign as the intersection is approached. He reiterated that when approaching the intersection from the west, as Claimant approached the intersection, one can first see the intersection at a distance approximately 690 feet from the intersection.

Porter acknowledged that the placement of warning signs such as a "T" intersection sign, or the double arrow signs is a function of engineering judgment.

Under questioning by the Commissioner, Porter stated that the *Uniform Manual on Signing* does not give specific distances or direct applications for the installation of double arrow signs. Further the MUTCD does not require that a double arrow sign be placed at a configuration such as existed at the intersection in question. Porter testified that any "T" intersection sign with a flashing yellow light would not be warranted in this case because of traffic volume and the fact that it was a two-way road; however, Porter stated he had not done any "assertation" of traffic counts at the intersection. Porter was not sure of the speed limit at the location in question because he didn't "recall seeing signs on Old Highway 50." Porter admitted that stopping times and distances would be impacted by the speed limit.

Upon questioning by the Commissioner as to special attention relating directly to the signing of vehicular roadways, Porter testified that his original experience was of a practical nature as a construction worker and laborer-foreman. He had poured a lot of concrete. Porter had

experience signing a detour around Cleveland, Ohio, but was essentially following the directions of his superiors. Porter testified he had been responsible for signing of county roads relative to construction work that was going on.

The Claimant has cited to the Court *Consolidated Freightways v. State* (1985), 37 Ill. Ct. Cl. 32. In that case, three of Claimant's trucks had, on three different occasions between April 21, 1974, and November 3, 1974, lost control and crashed on the same road at the same place where they encountered a section of highway which was slippery. On each occurrence, each driver was unable to control his truck. Each truck slid from Route 36 and crashed along an area north of the highway. It was shown that the section of highway in question had a strip of tar which, on becoming wet, became extremely slippery. The State had posted no warning signs alerting the motoring public of this condition. The testimony of police officers who investigated the accidents confirmed that the road became very slippery when wet, and that there had been other accidents from the same condition at the same location. Although the State had considerable notice of this hazard, the State had failed to warn the motoring public. An award was allowed.

The Respondent cited to the Court *Emm v. State* (1965), 25 Ill. Ct. Cl. 213. In *Emm*, the driver of a vehicle was injured when it ran into a bridge abutment that was under construction. The Court there observed that evidence was undisputed that in the 10.2 miles prior to the construction zone, there were nine warning signs indicating that the road was closed, and also indicating an alternate route. Prior to entering the actual construction zone, there were five roads on which to turn and take an alternate route. The construction zone itself began behind a

permanent barricade which extended across the middle of the road and was illuminated by flashing warning lights. The Claimant had gone around the barricade and traveled another 2.8 miles in the construction area. He bypassed two "Bridge Out" warning signs before reaching the scene of the accident. The Court held that there was no liability on the part of the State, and that the accident was the fault of the Claimant.

In *Gramlich v. State* (1981), 35 Ill. Ct. Cl. 19, the driver of a vehicle collided with, and went through, a guard rail and plunged down a steep embankment after traveling 130 feet in the air. There were no eyewitnesses, but the record indicated that the Claimants had been drinking and the driver was intoxicated. The Claimants contended that the State's failure to erect stop or warning signs at the intersection where the accident occurred proved the State's negligence. There were no stop or warning signs at the intersection, and there had been no prior accidents. This Court observed that the record was completely void of any notice to the State that this was a dangerous intersection or that there had been any previous accidents at the intersection. A recovery was denied.

The Claimant admits that he saw the stop sign at the intersection approximately two-thirds of the distance away from the intersection to the "Junction 50" sign (approximately 500 feet). He was traveling at 40 or 45 mph. He did not begin to slow or brake his motorcycle, but instead he "strained" to see why there was a stop sign for a couple of seconds. Upon realizing that the road upon which he was traveling required a stop at an intersection, he panicked and heavily applied his front and back motorcycle brakes. As a result of Claimant's application of the brakes on his motorcycle, the motorcycle flipped on top of him.

There is no question that the Claimant sustained severe and disabling injuries with medical bills in excess of $42,000.

The Claimant's expert testified that the intersection and stop sign could be seen from 600 feet away. IDOT employee Kuhn testified that the intersection and stop sign could be seen from a distance of 750 feet away. Kuhn's supervisor, Rendleman, testified that the intersection and stop sign could be seen from 1,000 feet away. Claimant's expert says that stopping distance at 40 to 45 mph is 450 feet under bad conditions and 300 feet under good conditions. Neither Claimant, nor any other witness, testified to facts from which it could in any way be concluded that Claimant could not have seen the stop sign at the intersection in adequate time to bring his motorcycle to a safe stop.

The Claimant's expert has opined that the conditions extant at the intersection, in his professional judgment, required additional and different signing, the absence of which created a hazardous condition at the intersection. Clearly, however, Claimant's expert bases his opinion on professional judgment and not on the mandates of either IDOT policy or the *Manual of Uniform Traffic Control Devices*. Expert Porter admits that his suggestions and opinions do not constitute required signing; but instead, the signing and configurations suggested by Porter would have reduced the hazard perceived by Porter to have existed at the intersection.

The issue in this case is not whether additional signing or a different configuration of signs might, or could, have prevented this accident. The question instead is whether the State was negligent in adopting the signing configuration that was present at the date and time of Claimant's accident, and whether that negligence was the proximate cause of Claimant's accident and the injuries and damage sustained by him. We are asked by the Claimant to assume that, if additional signs or a different configuration of signs had been utilized more in keeping

with the opinions of expert Porter, the accident would not have happened. This is a great leap supported almost entirely by speculation. In *Shirar v. State* (1965), 25 Ill. Ct. Cl. 256, there is a statement particularly relevant to the case at hand:

"The Court concludes that it must follow that failure to maintain a sign which was not required to be placed in the first instance, in no way constitutes negligence."

For the reasons stated above, this claim is denied.

## ORDER

Patchett, J.

This cause comes before the Court upon the petition for new trial or new hearing filed herein by the Claimant. The Court has carefully reviewed the petition for rehearing. The petition asks for a reversal of the opinion, or for a new trial, on the basis that the original opinion was against the manifest weight of the evidence. There is no new law or cases cited in the petition for rehearing.

The Court carefully considered the evidence and testimony of all the witnesses prior to issuing its original opinion. The Commissioner of this Court who tried this case is in the best position to determine credibility of the witnesses. This Court had reviewed the confidential recommendation of that Commissioner available before issuing its opinion.

There is nothing contained in the petition for rehearing to convince the Court that the original opinion is erroneous either as to facts or as to law. Therefore, the petition for rehearing is denied.